Arthur Lloyd Trull, Minor, by Arthur Trull, Father and Next Friend, Appellee, v. Sadie Ratner, Trading as Midwest Transfer Company (Not Incorporated), Appellant.

Gen. No. 44,546.

46

Opinion filed March 16, 1949.   Released for publication April 11, 1949.

Moses, .Bachrach & Kennedy and Richard E. Keogh, all of Chicago, for appellant.

Guy C. Guerine, George N. Guerine, both of Melrose Park, and McKinley & Price, of Chicago, for ap-

pellee; Guy C. Guerine, of Melrose Park, William McKinley and Paul E. Price, both of Chicago, of counsel.

Mr. Presiding Justice Burke delivered the opinion of the court.

Arthur Lloyd Trull, a minor, sued Sadie Ratner, doing business as Midwest Transfer Co., to recover for personal injuries sustained on January 24, 1946, when crossing Mannheim Road in the vicinity of Medill avenue in Leyden township, Cook county, he was struck by the northbound truck of the defendant, driven by Jesse Floyd. A trial resulted in a verdict for $30,000. Defendant's motion for a new trial was overruled and judgment was entered on the verdict. She appeals.

Arthur Trull, plaintiff, was about 11 years and 8 months old on Thursday, January 24, 1946. He lived with his parents and was a pupil in the fifth grade in a Lutheran school located at Fullerton avenue, west of Mannheim Road. On that day he left for school at about 8:30 in the morning, taking his lunch with him. At the lunch period he and Bruce Keith, another pupil, walked east to Mannheim Road, then south, with the intention of going to a store for the purpose of purchasing candy, the store being located on the east side of Mannheim Road near Medill avenue. Mannheim Road is a black top, four lane road, running in a northerly and southerly direction and is about 40 feet wide. Medill avenue runs in an easterly and westerly direction. It joins the west side of Mannheim Road at right angles. It also joins the east side of Mannheim Road at right angles about 95 feet north of the north line of Medill avenue as it runs west from Mannheim Road. This makes a jog of 95 feet in the continuity of Medill avenue at Mannheim Road. Medill avenue, running into Mannheim Road from the east is 24 feet wide and running into Mannheim Road from the west

is 20 feet wide. A surveyor's plat (on a scale of one inch equalling 10 feet) shows at approximately 3½ inches south of East Medill avenue on the east side of Mannheim Road the legend ''Pedestrian Crossing Sign.'' This places the sign at approximately 35 feet south of the intersection of Mannheim Road and East Medill avenue. These measurements were obtained by laying a ruler on the plat.

The area of the occurrence is a business district. There are business houses on both sides of the road. There is a subdivision on either side and the area is thickly populated. The temperature was about freezing. There was a smooth coat of ice on the road, and where the wheels had worn the ice down the spots were bare. Testimony introduced by plaintiff was to the effect that he was crossing Mannheim Road from the west to the east at the pedestrian crossing in company with Bruce Keith. Defendant's driver testified that the boy was crossing at the Medill avenue crossing. Plaintiff had traversed almost the entire distance and had almost cleared the intersection when he was struck by the truck. This truck and trailer weighed between 12,000 and 13,000 pounds. The driver saw the boys when they were 200 to 300 feet from him. The vehicle was equipped with vacuum hydraulic brakes in good condition. The driver stated that he was going at least 30 miles an hour. Plaintiff's witnesses place the speed of the truck at between 40 and 45 miles an hour. There was evidence that the driver did not change direction, reduce speed, blow a horn or give a signal. There was nothing to obstruct the view of the driver and as he came up that 200 or 300 feet he saw the boys all the time. There were no skid marks or brake marks on the road from the place where the plaintiff was struck up to where the truck stopped; nor were there any marks on the pavement indicating that the brakes had been applied. Plaintiff's witnesses testified that the vehicle proceeded from 150 to 200 feet after striking

the boy. Those who came to the aid of the boy found him lying in an unconscious condition about 15 feet east of the southeast corner of East Medill avenue and Mannheim Road. A deputy sheriff's car responded to a call and removed the boy to a hospital.

The defendant insists that the court erred in giving the following instructions:

"The court instructs the jury that at the time of the occurrence of the accident in this case there was in full force and effect in the State of Illinois, a statute which provided: 'Where traffic control signals are not in place or in operation, the driver of a vehicle shall yield the right-of-way, slowing down or stopping if need be to so yield, to a pedestrian crossing the roadway within any marked crosswalk or within any unmarked cross-walk at an intersection, except as otherwise provided in this article.'

"The court instructs you that when a tort or wrong is committed by an agent or employee in the course of his employment, and while pursuing his employer's business, the employer will be liable for any damages resulting from such tort or wrongful act although it is done without the employer's knowledge or consent, unless the wrongful act is a wilful departure from such employment or business.

"If from the evidence and under the instructions of the court you find that the plaintiff had the right-of-way over the defendant's truck, at the intersection in question, and if you further believe from the evidence that the plaintiff was at all times in the exercise of ordinary care, as was required of a minor of his age, experience and intelligence, then you are instructed that the plaintiff, until there was notice to him to the contrary, had the right to assume in the exercise of ordinary care that the driver of the defendant's truck would yield the right-of-way to the plaintiff."

In arguing this point defendant calls attention to the following definitions of "intersection" and

"crosswalk" in sections 13 and 14 of the Uniform Act Regulating Traffic on Highways (pars. 110 and 111, ch. 95½, Ill. Rev. Stat. 1947 [Jones Ill. Stats. Ann. 85.142, 85.143]):

"Intersection. The area embraced with the prolongation or connection of the lateral curb lines, or, if none, then the lateral boundary lines of the roadways of two highways which join one another at, or approximately at, right angles, or the area within which vehicles traveling upon different highways joining at any other angle may come in conflict.

"Crosswalk. (a) That portion of a roadway ordinarily included within the prolongation or connection of the lateral lines of sidewalks at intersections. (b) Any portion of a roadway distinctly indicated for pedestrian crossing by lines or other markings on the surface."

Defendant states that the way the streets are laid out "takes the locality of this accident out of the definition of an intersection, as defined by statute, because from the undisputed testimony there can be no prolongation or connection of the lateral curb lines at a point where there is a jog of 75 feet." We cannot agree with this view. The lateral curb lines, or lateral boundary lines of East Medill avenue can be prolonged to the west and projected across to the western lateral boundary line of Mannheim Road. These two highways join one another at right angles. In our opinion East Medill avenue and Mannheim Road intersect. In *Geschwindner v. Comer,* 222 Ill. App. 417, the court said (421):

"It is also contended that these instructions are erroneous for the reason, as it claimed, that Fourteenth street and Summit avenue do not intersect. It is contended by appellant that for Fourteenth street to intersect Summit avenue so as to come within the ordinance and statute, it would have to cross Summit avenue and extend on north. One of the definitions of

'intersect' given by the Cyclopedia of Law and Procedure, volume 28, page 39, is 'to cut into or between.' In construing the words of a statute or ordinance, it is necessary to have in mind the object sought to be attained, and the language used should be given that construction within reasonable bounds as will best tend to carry out such object. Traffic ordinances and statutes are enacted for the benefit and protection of all users of streets. It is but natural and proper that the same rule governing the approach of motor vehicles to the place where this accident occurred would have applied had Fourteenth street continued directly on through the park north of Summit avenue. The construction of the word 'intersection' in the ordinance and statute, contended for by appellant, would leave locations such as that existing at the place in question, without any authorized rule governing the approach of motor vehicles at right angles from the two streets. In our opinion, Fourteenth street and Summit avenue intersect at the place in question within the meaning of the statute and ordinance. It was therefore not error to give the instructions above referred to.''

The *Geschwindner* case was cited with approval in *Bell v. McMullen,* 327 Ill. App. 12.
██ The instruction on the right-of-way given at plaintiff's request is taken from sec. 74 of the Uniform Act Regulating Traffic on Highways (par. 171, ch. 95½, Ill. Rev. Stat. 1947 [Jones Ill. Stats. Ann. 85.203]). The evidence on which plaintiff relies to sustain the judgment is that he was crossing at a pedestrian crossing. The evidence does not show that he was crossing in the portion of the roadway ordinarily included within the prolongation of the lines that would be the sidewalk at the intersection. In *Stine v. Union Electric Co.,* 305 Ill. App. 37, it was held that the paragraph does not require a crosswalk to be actually included within the prolongation or connec-

tion of the lateral lines of sidewalks at intersections, or that the crosswalk be actually improved or designated in any particular way. The second paragraph of sec. 14 defines a crosswalk as "any portion of a roadway distinctly indicated by lines or other markings on the surface." The pedestrian crossing in the instant case was indicated by a surface mark bearing the legend "Pedestrian Crossing." We are of the opinion that this was sufficient compliance with the statutory definition of a crosswalk. It will be noted that all the witnesses who testified on the subject, including the driver, regarded the place of the occurrence as a pedestrian crossing. There was no testimony as to whether white lines indicating a pedestrian crossing were painted on the pavement. It would seem that placing on the surface of the roadway a sign marked "Pedestrian Crossing" would be as effective in warning a driver as lines drawn or letters imprinted on the surface. The latter would be more likely to be obscured by ice, snow and dirt.

▆▆ Defendant states that there is no proof that the sign was put up by state, county, village or city authority, and that it might have been put up by the owners of places of business in the vicinity for the purpose of inducing pedestrians to cross in front of their stores. The deputy sheriff told about the pedestrian crossing. A reading of the record convinces us that in the trial both parties assumed that the sign was placed there by someone in authority. There was no issue on that proposition. In the trial there was no conflict as to there being a pedestrian crossing. Under the factual situation the instructions as to a pedestrian having the right-of-way were proper. In view of the fact that there was no dispute as to the ownership, operation and control of the vehicle it was unnecessary to give the instruction as to agency. However, the giving of it could not harm defendant and is not reversible error.

■■ Defendant further maintains that the argument of counsel for plaintiff was prejudicial. As no objection to the argument was made during its delivery to the jury, or in the motion for a new trial, defendant cannot urge this point. We cannot agree with defendant's assertion that plaintiff did not exercise that degree of care for his own safety as should have been exercised by a boy of his age, capacity, intelligence and experience. There was testimony from which the jury had a right to find that plaintiff was in the exercise of due care for his own safety. *Moran v. Gatz,* 390 Ill. 478.

■ Finally defendant argues that the verdict is excessive. Plaintiff sustained a skull fracture, a marked deformity of the upper thigh due to a fracture of the upper third of the right femur, and had multiple bruises and lacerations of the body. When first seen by a physician he was bleeding from the right ear and nose and was in a semiconscious condition. The treatment included administration of blood plasma, adjusting the lower extremity as well as possible at the time. An orthopedic specialist was called into consultation. The only feeding given him was rectal for the reason that the intracranial pressure could not be increased by giving intravenous fluids, except for the blood plasma employed to combat shock. The rectal feeding continued for three days. For the first four or five days the boy's condition was critical. He was in Westlake hospital from January 24, 1946 to April 4, 1946. On March 14, 1946, an operation was performed and plaintiff's physicians did an open reduction on the femur, brought the edges of the bone together and put a body cast on. The cast extended from just below the neck down to the ankle. When the boy was taken home in April he was still in a body cast and had to have bed care. He could not be up or about. Subsequent X-rays showed the bones were not growing straight. Plaintiff had to return to the hospital where

the thigh was again operated upon, the bone pushed back and angulation corrected. These were major operations. X-rays were taken from time to time to check the progress of recovery. The skull fracture involved the right parietal bone and extended down through the lambdoidal suture into the occipital bone with a separation of one eighth to two eighths of an inch in the bone and was four inches long. After the second operation in July 1946, plaintiff remained in the hospital for a week. Immediately after this operation another body cast was put on extending from the upper part of the body down to the ankle. He was taken home and kept in the body cast for two months. His physician made calls twice a week for the first few weeks, then once a week until the body cast came off. When the second open reduction was made the physicians had to scrape the excess tissue to get the bone back to its position and correct the angulation.

Immediately after the mishap, the physicians observed a swelling over the right forehead about the size of a hen's egg. That swelling slowly and gradually decreased. It took about three or four months before it got down to where it was not apparent. The swelling was at the side of the fracture on the right side of the head. At the time of the mishap plaintiff did not complain as he was in a semiconscious state. After he was taken home from the second operation he complained of periodic headaches. The cast was taken off some time in September 1946. After that he got along on crutches for a period of about a month. He then used one crutch for a month. His physician saw him about a week prior to the trial, approximately two years after the occurrence. At that time plaintiff complained that when he gets up from a sitting position and when he stoops he has dizziness, and that after reading for a period of time he gets headaches. When he participates in games he cannot keep up with his playmates because of limited motion in the right leg

and headaches and dizziness. His physician, in the last examination, found plaintiff to have hyperactive reflexes. His complaint of dizziness and headaches two years after the occurrence indicated to his physician that there is a residual trauma resulting from the occurrence which, in his opinion, based on reasonable medical certainty, could be permanent. There is a permanent scar on plaintiff's leg which is visible from the previous operation and he has about 75 per cent flexion of the leg. It will not become normal. There is also atrophy of the muscles of the leg. There is a difference in the size of the right thigh and the left thigh. The atrophy is a result of the injuries. Plaintiff's physician was his family physician and testified that prior to the occurrence plaintiff was a normal and healthy youngster. Plaintiff's father assigned his cause of action for the necessary hospital and medicine expenditures to plaintiff. Plaintiff did not lose a grade in school during his illness.

From a recital of the injuries it becomes apparent that we would not be justified in saying that the amount of the verdict is excessive.

For these reasons the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

KILEY and LEWE, JJ., concur.